EZALLA HUSBAND *vs.* BERNICE DUBOSE.

No. 88-P-213.

Hampden. November 16, 1988. — December 20, 1988.

Present: GREANEY, C.J., KASS & FINE, JJ.

*Negligence,* One owning or controlling real estate, Social host.

The duty of care owed by a social host to invited guests does not include
furnishing protection from criminal acts at social gatherings, where
danger is not anticipated or where prevailing customs do not clearly
impose a duty of protection. [669-670]

In a civil action in which the plaintiff sought damages for the defendant's
alleged negligence in connection with a criminal assault on the plaintiff,
a guest in the defendant's home, by another guest, a verdict was properly
directed for the defendant where there was no evidence to show that she
reasonably could have foreseen the danger to the plaintiff or that the
defendant had failed to perform any duty imposed on her by prevailing
customs. [670-672]

CIVIL ACTION commenced in the Superior Court Department
on July 18, 1985.

The case was tried before *Constance M. Sweeney,* J.

*Michael A. Ugolini* for the plaintiff.

*Neil C. Darragh* for the defendant.

GREANEY, C.J.    The plaintiff seeks to recover damages
based upon the defendant's alleged negligence in connection
with an assault and battery by means of a deadly weapon
committed upon the plaintiff, a guest in the defendant's home,
by another guest. At the conclusion of the plaintiff's evidence
before a jury in the Superior Court, a judge of that court
allowed the defendant's motion for a directed verdict. We
affirm the judgment for the defendant.

The evidence in the plaintiff's case may be summarized as
follows. Late in the afternoon of May 25, 1985, the plaintiff,
age forty-five and the mother of four, drove to visit the defendant,

age fifty, at the defendant's home. The plaintiff was accompanied by Eleanor Pedraza, age twenty-three. The three women knew each other. Pedraza seemed to the plaintiff to be either "drunk or high". While at the defendant's home, the women socialized for about an hour. They then decided to go over to another friend's house. As the three were about to leave, Pedraza suddenly announced that she could "whup [the plaintiff's] ass." This comment was apparently over the repayment of $20 the plaintiff owed Pedraza.

The defendant, attempting to intercede, told Pedraza not to start anything in her house. Pedraza responded by telling the defendant to "[g]et out of [her] face" and by pushing the defendant to the floor. Pedraza then pushed the plaintiff. After being pushed, the plaintiff struck Pedraza with the telephone receiver. With Pedraza bleeding from the blow, and the plaintiff clutching the now cordless receiver, the scuffle intensified. Specifically, as the plaintiff testified, while "it really wasn't fist-fighting," she and Pedraza "wrestl[ed]" and "tussl[ed]" for about thirty minutes trying to "flip" each other onto the floor. The plaintiff asked the defendant "to try to stop [Pedraza]." The defendant said: "I have talked to you all, you all won't listen to me, you all fight it out."

Eventually, the plaintiff got on top of Pedraza and "pinned her". Pedraza promised the plaintiff that she would stop fighting. After being let up by the plaintiff, Pedraza headed toward the kitchen, emerging a short time later brandishing a butcher's knife. She stated to the two women that "[she was] going to kill you all, mother fuckers." Upon hearing this, and seeing Pedraza with the knife, the defendant, who to the plaintiff "seem[ed]" and "appeared scared," told the plaintiff to run out of the house. Acting on her own advice, the defendant then ran outside. Instead of leaving the house, the plaintiff backed up slowly, attempting to "calm [Pedraza] down with the knife," and to "talk her out of it." She eventually backed up to the living room door and got herself outside the screen door leading to that room. As the plaintiff held the door shut with her arm, in an attempt to keep Pedraza from coming out, Pedraza started slicing through the screen door, eventually cutting the plaintiff

in the arm, chest, and face. The plaintiff subsequently let go of the door and ran to a neighbor's house. The neighbor immediately made a telephone call to the police, who arrived about eleven minutes later. Before running to the neighbor's house, the plaintiff was momentarily in the defendant's front yard, where she heard Pedraza still yelling "I'm going to kill you mother fucker," and the defendant "still hollering, [r]un."

In ascertaining whether the defendant's motion for a directed verdict was properly allowed, we inquire whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. If any such combination of circumstances could be found it is . . . immaterial how many other combinations could have been found which would have led to conclusions adverse to the plaintiff." *Campbell* v. *Thornton*, 368 Mass. 528, 535 (1975), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). Like the judge, we concentrate on the scope of the defendant's duty to the plaintiff.

The defendant was a social host to the plaintiff and Pedraza, both of whom had dropped by the defendant's home for what appears to have been an unexpected visit. Informal social contacts of the sort involved here would not give rise to a special or established relationship in the same sense as described in cases such as *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983). See also *Dhimos* v. *Cormier*, 400 Mass. 504, 506-507 (1987). Although the contacts between a social host and an invited guest have been described as creating, in some circumstances, a "special relationship," *Polak* v. *Whitney*, 21 Mass. App. Ct. 349, 352 (1985), the "obligations [a host] assume[s are] those which, considering customs and accepted social norms, one would reasonably expect [the host] to fulfill, no more and no less." *Ibid.*, and cases cited. These customs and norms involve, to some extent, the foreseeability of the harm and a defendant's ability to prevent it. As a general rule, "[t]here is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant." *Glick* v. *Prince Italian Foods of*

*Saugus, Inc.*, 25 Mass. App. Ct. 901, 902 (1987), and cases cited. See *Schmid* v. *National Bank of Greece, S.A.*, 622 F. Supp. 704, 712 (D. Mass. 1985), aff'd. 802 F.2d 439 (lst Cir. 1986); Restatement (Second) of Torts § 314A, comment e (1964) (a defendant is "not required to take precautions against a sudden attack from a third person which he has no reason to anticipate . . . .")

Unlike common carriers, see *Sharpe* v. *Peter Pan Bus Lines, Inc.*, 401 Mass. 788 (1988), bars and other businesses, see *Kane* v. *Fields Corner Grille, Inc.*, 341 Mass. 640 (1961), colleges, see *Mullins* v. *Pine Manor College, supra*, or even hospitals, see *Copithorne* v. *Framingham Union Hosp.*, 401 Mass. 860 (1988), which have been held to be required to foresee that their patrons, students, or patients could suffer criminal attacks by third persons, social hosts ordinarily would not be expected to anticipate that a guest in their home or apartment might be violently attacked with a deadly weapon by another guest. Further, neither "the nature of the situation," nor " 'existing values and customs,' " see *Mullins* v. *Pine Manor College*, 389 Mass. at 51, dictate that social hosts have a duty to protect their visitors or to make their property safe from such criminal acts. Hosts normally do not voluntarily assume such obligations, and visitors ordinarily do not rely or depend upon their hosts for such protections. In the absence of a situation showing that a danger should have been anticipated, or customs which clearly impose a duty of protection or a preferred form of response, hosts should not be charged, at the risk of liability, to furnish security at social gatherings or to call the police every time a guest becomes unruly. It is in this context that the sufficiency of the plaintiff's evidence must be assessed.

When the plaintiff and Pedraza started arguing, the defendant warned Pedraza against starting anything in her home. The plaintiff herself escalated the initial disagreement beyond the pushing stage by hitting Pedraza with the telephone receiver, and then she voluntarily engaged Pedraza in a lengthy wrestling match. That match ended with Pedraza subdued, the plaintiff unhurt and in control, and the appearance that the two women

were ready to behave themselves. Pedraza's subsequent appearance with the knife was sudden and unexpected. Her stated intention to kill was forcefully directed at both the defendant and the plaintiff. The defendant, now in danger herself and badly frightened, could not have been expected to disarm Pedraza or to remain in the house.[1] The defendant's warning to the plaintiff to follow her example and avoid the danger was an adequate response to a very dangerous situation that had arisen suddenly. Instead, the plaintiff chose to ignore the warning and stayed and tried to reason with Pedraza.

We perceive no legally sufficient evidence from which it properly could be concluded that the defendant knew, or should have known or anticipated, that Pedraza may have been prone to attack someone with a deadly weapon. There is also insufficient evidence to warrant a finding that, when Pedraza went into the kitchen, the defendant knew, or should have known, that she was about to return and attack both women with a knife. Contrary to the plaintiff's contention, the initial wrestling episode did not furnish a basis from which the defendant reasonably could have foreseen or anticipated the precipitous criminal act that occurred or the probability of the injury that eventually resulted. We are also not prepared to say that prevailing values and expectations required the defendant to be more vigilant of security, to intervene directly, or to summon assistance at the risk of serious personal injury to herself or of causing greater danger to the plaintiff. Recognizing that "[c]ases of this character must be decided one by one, applying common law principles," *McGuiggan* v. *New England Tel. & Tel. Co.*, 398 Mass.

---

[1] There is insight in the defendant's observations about the legal dilemma that faced her. We quote from her brief: "If the defendant had immediately run to a neighbor's house to 'get help' or had gone to another room to use a telephone, and the plaintiff had been stabbed during that time, the plaintiff would, instead, be alleging that the defendant negligently left her and Pedraza alone. And if the defendant had attempted to physically intervene in the physical confrontation and the plaintiff had been injured during this involvement, the plaintiff would, instead, be alleging that the defendant was guilty of negligence in actively participating in the altercation. Indeed, any efforts by the defendant, a fifty year old woman, to intervene on behalf of the plaintiff could have increased the risk of harm to the plaintiff and to herself."

152, 161 (1986), we conclude, as did the judge, that the circumstances imposed no duty on the defendant.[2] The case, therefore, falls within that limited class of negligence actions which can be properly decided for the defendant as matter of law.[3] See *Luz* v. *Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 203-204 (1964); *Mullins* v. *Pine Manor College, supra* at 56; *Dhimos* v. *Cormier*, 400 Mass. at 506-507; *Polak* v. *Whitney, supra* at 351-354.

*Judgment affirmed.*

---

[2] We see no need to discuss in great detail the plaintiff's arguments, which stitch together principles from many personal injury cases decided by the Supreme Judicial Court and this court in an effort to frame a theory of liability. We reject the argument that *Mounsey* v. *Ellard*, 363 Mass. 693 (1973), and its progeny, should be extended, as matter of course, to include, within the concept of dangerous conditions on land, the prevention of harm that might arise from the presence in a private home of a potentially dangerous social guest. The myriad cases relied upon by the plaintiff are distinguishable because they involve situations in which the defendant either had control over, created, worsened, or should have anticipated, the risk involved, or situations in which the defendant voluntarily assumed an obligation. See, e.g., *Wheeler* v. *Darmochwat*, 280 Mass. 553 (1932); *Bellows* v. *Worcester Storage Co.*, 297 Mass. 188 (1937); *Gidwani* v. *Wasserman*, 373 Mass. 162 (1977); *Oldham* v. *Nerolich*, 389 Mass. 1005 (1983); *Mullins* v. *Pine Manor College*, 389 Mass. at 47. See also *Polak* v. *Whitney*, 21 Mass. App. Ct at 353 (no duty on the part of a social host to warn guests of dangers that are obvious to persons of average intelligence). Finally, Restatement (Second) of Torts § 318 (1964), on which the plaintiff relies, has no application to these facts because the principles discussed in that section primarily concern the duty of a land occupier to control a licensee who is conducting an activity on the land.

[3] Our decision, which rests on the issue of duty, makes it unnecessary to consider the alternative ground relied upon by the judge, which concerns the issue of proximate causation. We do, however, note that there was no showing in the plaintiff's evidence that, had the defendant called the police as soon as she got outside of the house, the police would have arrived in time to stop the stabbing. The indication in the evidence is the exact opposite — that the approximate eleven minute time needed for the police to respond would not have been fast enough in any event to avert the plaintiff's injury.