650 A.2d 1152

**William H. BECK, individually, in his own right, and as Administrator of the Estate of William John Beck, deceased, Appellant,**

**v.**

**Albert ZABROWSKI, The Borough of Jermyn, and Pennsylvania Power & Light Co.**

Commonwealth Court of Pennsylvania.

Argued Sept. 19, 1994.

Decided Nov. 18, 1994.

386

Peter G. Loftus, for appellant.

Donald E. Wieand, Jr., for appellees Zabromski and Borough of Jermyn.

William M. Blaum, for appellee Pennsylvania Power & Light Co.

Before PELLEGRINI and KELLEY, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

William H. Beck (Beck), individually and as Administrator of the Estate of William John Beck (Decedent), his late son, appeals an order of the Court of Common Pleas of Lackawanna County (trial court) which granted the motions for summary judgment filed by Albert Zabrowski (Zabrowski), the Borough of Jermyn (Borough), and Pennsylvania Power & Light Co. (PP & L).

On May 11, 1988, the Decedent was the driver of an automobile, with passenger Thomas O'Neil (O'Neil), which collided with a steel utility pole located on Cottage Street in the City of Carbondale (Carbondale). The pole was owned by

PP & L and was located approximately eight (8) inches from the paved portion of Cottage Street on the left side thereof at a distance of approximately sixty-three (63) feet north of its intersection with Route 6.

The events giving rise to the accident were testified to by O'Neil by way of deposition and are summarized as follows. O'Neil met the Decedent at the home of the Decedent's parents in Carbondale at approximately eight o'clock (8:00 p.m.) on the evening of May 10, 1988. Decedent was home from Washington, D.C. for the purpose of celebrating his twentieth birthday. O'Neil and the Decedent spent the next four hours driving around in the Decedent's vehicle with their girlfriends during which time they consumed an unknown number of cans of beer. O'Neil and the Decedent dropped the girlfriends off around midnight and stopped at a Turkey Hill convenience store in Simpson so that O'Neil could phone his parents to inform them that he would be spending the night at the home of the Decedent's parents. While still in Simpson, the Decedent proceeded to drive by the home of one Tim Rafferty (Rafferty), an acquaintance, at which point he turned off his headlights and sideswiped Rafferty's vehicle before speeding away.[1]

O'Neil and the Decedent next proceeded to another Turkey Hill store located in Archbald to get something to eat. After purchasing snack food and exiting the store, O'Neil and the Decedent urinated in the store's parking lot. While in the process of relieving themselves, O'Neil and Decedent were approached by two women entering the convenience store who verbally admonished the men for their conduct. Upon exiting from the store, the two women continued to berate both O'Neil and the Decedent. The women then attempted to leave the parking lot in their vehicle only to have the exit blocked by the Decedent's automobile. The Decedent put his car into reverse at this point and bumped into the women's car[2] before speed-

---

1. O'Neil testified that it was at this point in the evening when he first noticed that the Decedent was drunk. (S.R.R. 087B.)

2. Jackie Parry and Theresa Peters, the women from the Turkey Hill parking lot, both testified by way of deposition that the Decedent

ing off traveling north toward the Borough.[3]

While driving through the Borough, O'Neil noticed flashing red and blue lights behind them and discovered that they were being followed by Zabrowski, Chief of Police of the Borough.[4] As Zabrowski drove alongside of the Decedent's vehicle in an attempt to pull it over, the Decedent made a right hand turn and sped away.[5] Decedent then failed to stop at a stop sign as he turned onto Route 6 and headed east away from the Borough toward Carbondale. Once on Route 6, the Decedent's vehicle sped away from Zabrowski.[6] (S.R.R. 109B.)

Decedent sped along Route 6 toward Carbondale and O'Neil noted that the speedometer registered 80 miles per hour.[7] At

backed into their vehicle between three to five times pushing it back across the parking lot. (S.R.R. 238b, 264b–269b.)

3. The women reported the incident to the Archbald police who, in turn, forwarded the information, including a description of the Decedent's vehicle and license plate/registration number, to the Borough's police. (S.R.R. 250b.) The Decedent's vehicle was traveling on Main Street as it left Archbald; such road becomes South Washington Avenue in Jermyn. (S.R.R. 008B.)

4. Zabrowski testified by way of deposition that, after spotting the Decedent's vehicle and confirming the registration number, he, with the use of his flashing lights and no siren, began pursuit of the Decedent's vehicle. (S.R.R. 009B–011B.)

5. Decedent had been traveling west on Rush Brook before turning right onto Fifth Street in an attempt to elude Zabrowski. (S.R.R. 011B–012B.) O'Neil testified as follows:

Q. Was Bill (Decedent) trying to evade the police car?
A. Yes.
(S.R.R. 104B.)

6. At this point, Zabrowski discontinued his pursuit of the Decedent's vehicle and notified the Carbondale police of its approach. Zabrowski continued to drive along Route 6 at the posted speed limit in an attempt to keep the Decedent's taillights in view so that he might inform Carbondale's police if and when Decedent turned off of Route 6. (S.R.R. 013B–014B.) While driving on Route 6, Zabrowski lost sight of the Decedent's taillights and only remade visual contact with the vehicle as he approached the intersection of Route 6 and Cottage Street and witnessed the debris at the accident scene. (S.R.R. 016B–017B.)

7. O'Neil testified that Route 6 was a two lane highway divided by a double yellow line with sharp curves and several winding sections. O'Neil testified that there were points in time when not all four wheels were even touching the ground. (S.R.R. 111B–112B.)

O'Neil's suggestion, after nearly missing by inches telephone poles located along the right side of Route 6, the Decedent drove in the middle of Route 6 straddling the double yellow line and occasionally drove entirely on the left side or westbound lane of the road. (S.R.R. 110B–113B.) As the Decedent's vehicle approached the Y intersection with Cottage Street, the Decedent drove all the way over to the left or westbound side of Route 6, turned off his headlights, and without slowing down, cut his wheels to the right to "aim down towards Cottage Street." (S.R.R. 113B–115B.) At this point, the Decedent failed to negotiate the turn and lost control of his vehicle which slid sideways across Cottage Street, off the road, and into the utility pole.[8] The Decedent's vehicle was cut in half as a result of colliding with the pole.[9] Decedent was pronounced dead on the scene.[10]

Beck brought a wrongful death and survival action against Zabrowski, the Borough, and PP & L. Beck claimed that

8. O'Neil testified that the area was illuminated so that you could see even without headlights. (S.R.R. 116B.) O'Neil also testified as follows:

Q Have you ever driven up Route 6 before and made a right turn onto Cottage?
A Yes. Sure.
Q If you do that, do you go anywhere near the pole?
A Well, I never did it at top speed.
Q I mean if you're doing it at the speed limit and you just turn off Route 6 and make a right turn onto Cottage, do you go anywhere near that pole?
A I can't imagine you could accidently hit that pole if you were just driving at a fairly sane rate of speed.
(S.R.R. 117B–118B.)

9. The front half of the vehicle, from the front seats forward, continued approximately two-hundred twenty-eight feet (228) down the right side of Cottage Street before striking the front porch of a home. The rear of the vehicle continued down the right side of Cottage Street for approximately eighty-one feet (81) before eventually coming to rest. (S.R.R. 403b–404b, R.R. 112.)

10. Following the accident, blood alcohol tests were performed on the Decedent by St. Joseph's Hospital and the coroner with both tests yielding a blood alcohol content of .17 percent. (S.R.R. 404b.) Pursuant to Section 3731(a)(4) of the Vehicle Code, a person with a blood alcohol content of .10% or greater is guilty of driving under the influence of alcohol.

Zabrowski had negligently engaged in pursuit of the Decedent's automobile and that the Borough negligently failed to properly instruct, adequately train, or properly supervise its police officers, all of which allegedly contributed to the Decedent's death. As to PP & L, Beck claimed that PP & L was negligent in its placement of the utility pole on Cottage Street and that such negligence contributed to the cause of the accident.

After the pleadings were closed, Zabrowski and the Borough filed a joint motion for summary judgment. PP & L also filed a separate motion for summary judgment. By opinion and order dated May 12, 1993, the trial court jointly addressed and granted both motions for summary judgment. The trial court concluded that Zabrowski and the Borough were immune from liability based upon our Supreme Court's decision in *Dickens v. Horner*, 531 Pa. 127, 611 A.2d 693 (1992). The trial court also concluded that liability could not be imposed upon PP & L because the causal connection between the placement of the utility pole and the Decedent's accident is too remote. On appeal to this Court,[11] Beck contends that the trial court erred in granting both motions for summary judgment.

We begin by noting that a party is entitled to summary judgment where there are no issues of material fact and when viewing the record in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Thompson Coal Company v. Pike Coal Company*, 488 Pa. 198, 412 A.2d 466 (1979). It is important to note that O'Neil was the only witness to the events immediately preceding the accident as well as being the sole witness to the accident itself. Such being the case, since the facts as set forth above are not in dispute, there are no material facts at issue herein. Thus, our sole concern is whether as a matter of law any of the moving parties were entitled to judgment.

11. Our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law. *Shubert v. Southeastern Pennsylvania Transportation Authority*, 155 Pa.Commonwealth Ct. 129, 625 A.2d 102 (1993).

██ Beck contends that the trial court misapplied the decision in *Dickens* which held that liability could not be imposed upon a township or its police officers for injuries to a third party which resulted from the superseding criminal acts of a fleeing suspect in a vehicular pursuit case. 531 Pa. at 130–131, 611 A.2d at 695. Beck argues that since a third party was neither injured nor seeks recovery against the Borough or Zabrowski, *Dickens* has no application herein. In *Hawks v. Livermore,* 157 Pa.Commonwealth Ct. 243, 629 A.2d 270 (1993), this Court acknowledged that the holding in *Dickens* is limited to situations where the actions of the fleeing suspect caused harm to a third party; however, this Court further recognized the incongruity of a decision allowing a fleeing suspect to hold a governmental unit liable when her actions resulted in harm to herself, whereas if she had injured a third party, the governmental unit would not be liable to the third party. 157 Pa.Commonwealth Ct. at 247, 629 A.2d at 272. This Court, in *Hawks,* thereafter held that "[b]ecause the Borough is shielded from liability for injuries to innocent third parties as a result of a police chase because of the suspect's criminal actions in fleeing the police it would be completely inconsistent to allow the fleeing suspect to collect damages from the Borough by ignoring her criminal actions." *Id.* at 248, 629 A.2d at 272. Thus, where, as here, the suspect's criminal actions in fleeing the police causes harm to the suspect himself instead of harm to a third party, liability cannot be imposed upon the township or its police officers.[12]

Section 8541 of the Judicial Code governs governmental immunity generally and provides as follows:

Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any

12. *Hawks* was decided on July 21, 1993, which was after the trial court had made its decision herein. However, an appellate court may affirm the judgment of a trial court where the result is correct, even though the reason given is erroneous, where the correct basis for the decision is clear on the record. *Rhoads v. Lancaster Parking Authority,* 103 Pa.Commonwealth Ct. 303, 520 A.2d 122, *appeal denied,* 515 Pa. 611, 529 A.2d 1084 (1987).

injury to a person or property caused by any action of the local agency or an employee thereof or any other person.

42 Pa.C.S. § 8541. Section 8542 of the Judicial Code governs exceptions to governmental immunity and provides, in pertinent part, as follows:

(a) **Liability imposed.**—A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):

(1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

(2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). *As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.* (Emphasis added.)

42 Pa.C.S. § 8542(a). Liability for negligent acts may be imposed if the two conditions of subsection (a) are satisfied and the injury occurs as a result of one of eight acts described in subsection (b). *See* 42 Pa.C.S. § 8542(b). The Supreme Court concluded in *Dickens* that it would be incongruous to interpret the Judicial Code in such a way that the municipality would be shielded from liability for the crimes of its agents and employees, yet responsible for the crimes of others. 531 Pa. at 131, 611 A.2d at 695, *citing Mascaro v. Youth Study Center,* 514 Pa. 351, 363–364, 523 A.2d 1118, 1124 (1987). As was the case in *Dickens,* Beck seeks to impose liability on Zabrowski and the Borough for an accident which was caused by the criminal acts of the Decedent. Accordingly, the Borough and Zabrowski were entitled to judgment as a matter of

law and the trial court did not err by granting summary judgment in their favor.

With regard to the motion of PP & L, Beck contends that the trial court erred by concluding that, as a matter of law, PP & L was not liable for its placement and maintenance of the utility pole in question herein. Utility companies have long been held liable for harm caused by the negligent placement and maintenance of utility poles. *See Frangis v. Duquesne Light Company*, 232 Pa.Superior Ct. 420, 335 A.2d 796 (1975). Liability may be imposed upon a utility where the placement of a pole close to the edge of a highway constitutes a foreseeable and unreasonable risk of harm to users of the highway. *Scheel v. Tremblay*, 226 Pa.Superior Ct. 45, 312 A.2d 45 (1973). Thus, in situations where, as here, the utility pole in question was in close proximity to the edge of the road, in order for a utility company to be subject to liability, the risk of harm in addition to being unreasonable [13] must also be foreseeable. *See Caldwell v. PENNDOT*, 120 Pa.Commonwealth Ct. 358, 548 A.2d 1284 (1988).

The trial court determined that the series of events herein were not reasonably foreseeable and therefore that PP & L was not subject to liability. In so doing, the trial court found that PP & L was not required to anticipate that the Decedent, who was driving under the influence of alcohol at an excessive rate of speed while attempting to flee from the police without the aid of headlights, would proceed in the wrong lane of travel, make a sharp turn into another roadway, and then

13. In determining whether the location of a utility pole adjacent to a roadway constitutes an unreasonable risk of harm to users of the highway, the conditions of the roadway are critical. *See Scheel*, 226 Pa.Superior Ct. at 48, 312 A.2d at 47 (where an automobile struck a utility pole located ten inches from the paved portion of the road on the same side of travel as the automobile, the narrowness and general contours of the road, the lack of illumination of the pole, the presence or absence of reflective markers, the proximity of the pole to the highway, the availability of less dangerous locations, and the natural tendency of westbound traffic to veer toward the middle of the road near this pole are circumstances in light of which a jury could find that the utility's placement and maintenance of the pole constituted an unreasonable danger to users of the highway).

strike a pole located eight inches from the roadway on the opposite side of the road from the correct lane of travel.

Beck has failed to cite in his brief and our research reveals no other cases remotely similar to the undisputed facts of this case which imposed liability upon the utility company or required submission of the matter to a jury. Thus, the trial court did not err by concluding that, as a matter of law, PP & L was entitled to judgment.

Accordingly, the order of the trial court granting summary judgments in favor of Zabrowski, the Borough, and PP & L will be affirmed.

## *ORDER*

AND NOW, this 18th day of November, 1994, the order of the Court of Common Pleas of Lackawanna County, dated May 12, 1993, granting summary judgments in favor of Albert Zabrowski, the Borough of Jermyn, and Pennsylvania Power & Light Co. is affirmed.