KATCHER AFARIAN & another,[1] administrators,[2] *vs.*
MASSACHUSETTS ELECTRIC COMPANY & others.[3]

Suffolk. April 3, 2007. - May 30, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Negligence,* Wrongful death, Utility pole, Duty to prevent harm. *Intoxication.*
*Practice, Civil,* Parties, Complaint, Motion to amend.

In an action arising out of the death of the plaintiffs' son, who was killed
when the automobile in which he was a passenger veered off the road and
struck a pole owned by the defendant utilities, the trial court judge did not
err in granting summary judgment in favor of the defendants, where the
plaintiffs failed to demonstrate that defendants owed a duty to the decedent
to exercise reasonable care in the placement of the pole, given that the
operator of the automobile, who was intoxicated at the time of the crash,
could not be said to have deviated from the road in the ordinary course of
travel, and his deviation was not, and could not have been, reasonably
anticipated by the defendants. [261-267]
In a wrongful death action commenced in 1999, in which the plaintiffs alleged
that the defendant supermarket had negligently sold alcohol to an underage
driver before the crash that caused the death of the plaintiffs' son, a motion
judge applied correct legal principles and acted within her discretion in
denying the plaintiffs' motion to amend, filed in 2004, to add a second
supermarket as a defendant, where undue prejudice resulted from the
delay, and where the plaintiffs reasonably should have known long before
moving to amend the complaint that the second supermarket, and not the
first, had sold the alcohol in question. [267-270]

CIVIL ACTION commenced in the Superior Court Department on
April 23, 1999.

A motion to amend the complaint was heard by *Nancy Staffier*

---

[1] Maryann Afarian.

[2] Of the estate of Peter M. Afarian.

[3] New England Telephone and Telegraph Company; Bell Atlantic Corpora-
tion; and Market Basket, Inc. The plaintiffs' claims against Market Basket
eventually were dismissed. The plaintiffs appeal from the denial of their mo-
tion to amend their complaint to add Demoulas Super Markets, Inc. (Demou-
las), as a defendant. Demoulas appeared at the Superior Court and before us
to oppose the relief requested by the motion.

*Holtz*, J., and the case was heard by *S. Jane Haggerty*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Anthony Tarricone (Joseph P. Musacchio* with him) for the plaintiffs.

*Paul M. Moretti (Chrisann Leal* with him) for Demoulas Super Markets, Inc.

*Andrea Peraner-Sweet (Francis J. Sally* with her) for Massachusetts Electric Company.

*Thomas M. Elcock (William A. Worth* with him) for New England Telephone & Telegraph Co. & another.

The following submitted briefs for amici curiae:

*Matthew R. Peterson & Richard J. Morrison* for Western Massachusetts Electric Company & others.

*Nicholas J. Scobbo, Jr., & Sherry L. Vaughn* for Massachusetts Municipal Utility Self-Insurance Trust Fund.

*Marsha V. Kazarosian & J. Michael Conley* for Massachusetts Academy of Trial Attorneys.

GREANEY, J. This wrongful death case arises out of a fatal automobile crash that was preceded by underage drinking. In the early morning of July 28, 1996, the plaintiffs' son, Peter Afarian (Afarian), was killed when the automobile in which he was a passenger veered off the road and struck a utility pole. The driver, Jason Veilleux, was intoxicated and fell asleep at the wheel. The plaintiffs asserted claims of wrongful death predicated on negligence, gross negligence, and wilful or reckless conduct against Massachusetts Electric Company, New England Telephone and Telegraph Company, and Bell Atlantic Corporation,[4] based on the placement of the utility pole. The plaintiffs also asserted wrongful death claims against the defendant Market Basket, Inc., on the ground that it had sold the alcohol consumed by Veilleux to his underage friend. Later in the course of the litigation, the utility defendants moved for

---

[4]We shall refer to the Massachusetts Electric Company as MEC. We shall refer to the New England Telephone and Telegraph Company and Bell Atlantic Corporation as the telephone company. Collectively, we refer to MEC and the telephone company as the utility defendants.

summary judgment, contending that they owed no legal duty to Afarian. After discovering that the alcohol consumed by Veilleux had been sold by a supermarket owned by Demoulas Super Markets, Inc. (Demoulas), and not by Market Basket, the plaintiffs moved to amend their complaint to add Demoulas as a defendant. A Superior Court judge granted summary judgment in favor of the utility defendants, and a different Superior Court judge denied the plaintiffs' motion to amend their complaint. We transferred this case here on our own motion. We affirm the challenged orders.

1. *Summary judgment.* The material undisputed facts relative to the motion for summary judgment are as follows.[5] On July 27, 1996, Veilleux, along with Sean Croteau and Peter Daniels, went to a supermarket[6] in Salem, New Hampshire. Daniels, who had his brother's identification, purchased three thirty-packs of beer. They were all below the legal drinking age of twenty-one years. See G. L. c. 138, § 34A. They returned to Massachusetts.

Later that day, Veilleux picked up Afarian, and the two then were joined by some of their other friends. The group drove to Mansfield in two automobiles to attend a concert. They brought the beer that had been purchased earlier that day and drank nearly all of it before the concert started.

After the concert, in the early morning of July 28, Afarian,

---

[5]The docket and record appendix are not models of clarity. We pause to remind counsel to adhere to Mass. R. A. P. 18 (d), as appearing in 370 Mass. 919 (1967), when compiling the record appendix. See *Shawmut Community Bank, N.A.* v. *Zagami*, 411 Mass. 807, 810-812 (1992). We add that it appears that the appeal is improperly before us because no final judgment entered pursuant to Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977), and it is not clear from the docket or record whether all claims have been finally resolved against all parties. See *Harrison* v. *Roncone*, 447 Mass. 1001, 1001-1002 (2006). This defect is particularly troubling in view of the facts that no "judgment" in favor of the utility defendants was noted on the docket, see *Lewis* v. *Emerson*, 391 Mass. 517, 520 (1984), and a Superior Court judge denied the plaintiffs' motion for separate and final judgment pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), in favor of the utility defendants (although that denial is not specified on the docket, the telephone company has provided a copy of the judge's ruling). Also, it appears that judgment entered only in favor of Market Basket and third-party defendant Scott Munroe.

[6]The precise supermarket is not material to the summary judgment analysis, but has relevance in the section concerning the motion to amend.

Scott Munroe, and Ryan Moynihan joined Veilleux to return home in the automobile Veilleux was driving, a 1995 Honda Accord. Afarian was seated in the front passenger seat and fell asleep during the ride; Munroe and Moynihan were seated in the back seat. Veilleux was intoxicated. It was a clear night, and the road was dry and well lit. Veilleux was driving east on Route 133 in Andover, a road with which he was familiar. He was traveling at a speed between fifty-one and sixty miles per hour; the posted speed limit was forty miles per hour. Veilleux fell asleep at the wheel. He woke and saw a utility pole five to ten feet in front of him. The pole had a street light on it. Veilleux may have swerved to the left, but he hit the pole. There were no preimpact skid marks to indicate any braking before impact. Afarian was taken to a hospital where he was pronounced dead. The others were not seriously injured. Veilleux later pleaded guilty to charges of driving while intoxicated and motor vehicle homicide.

The crash took place on the south edge of Route 133, just past the entrance to a Raytheon facility and where the road curves to the left. The utility pole was located on the outside of a horizontal curve to the left, some six inches from the edge of Route 133 and between the curb and the sidewalk that run parallel to the road. As Veilleux had approached the curve, he continued straight or slightly to the right, hitting the pole. The point of impact with the pole was approximately six inches from the front right corner of the automobile. At the time of impact, the right front corner of the automobile had crossed approximately twelve inches off the paved portion of Route 133.

The utility pole that Veilleux hit is jointly owned by MEC and the telephone company pursuant to a joint ownership agreement. Under the agreement, MEC is responsible for the care and maintenance of the pole. Each party, however, is responsible for the care and maintenance of its own attachments.

The pole was installed in 1969 pursuant to a license granted by the town of Andover.[7] When the pole was set, representatives from both MEC and the telephone company visited the site to determine its exact location and to provide the necessary

---

[7]Prior to 1969, two poles were located across the street from where the pole currently sits. The poles were located on the inside of the curve.

engineering. The pole was designated by MEC as pole no. 608 and as pole no. 146 by the telephone company. The State highway right of way within which the pole was located extends beyond the edge of the paved roadway. MEC installed the pole in accordance with New England Electric System (NEES) Standard CS 2032[8] and in accordance with all National Safety Electric Code standards. The pole also complies with Massachusetts regulations.[9] See 220 Code Mass. Regs. § 125.23 (1993).

The pole was inspected in 1987 pursuant to NEES Standard 2015, dated July, 1977, and was accepted.[10] From the time that the pole was set in 1969, up to and including July 28, 1996, MEC never relocated, replaced, or changed the position of the pole. MEC has complied, and continues to comply, with all National Electric Safety Code and company standards concerning the design, installation, construction, inspection, and maintenance of the pole. After the fatal crash involving Afarian, the pole was replaced by another pole in approximately the same location.

To prevail on their wrongful death claims, the plaintiffs must prove negligence on the part of the utility defendants. An essential element of every negligence claim is the existence of a legal duty, which is the determinative issue in this case. See *Glidden* v. *Maglio*, 430 Mass. 694, 696 (2000). The existence of a legal duty is a question of law appropriate for resolution by summary judgment. *Jupin* v. *Kask*, 447 Mass. 141, 146 (2006). In the *Jupin* case, we set forth the guiding principles for determining the existence of a legal duty:

> " 'The concept of "duty" . . . "is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the

---

[8]This standard speaks to the positioning of poles: "Poles shall be set with face not less than [six inches] from street side of curb."

[9]The regulations pertain to clearances involving wires and supporting structures. See 220 Code Mass. Regs. § 125.23 (1993). The regulations require that supporting structures, such as utility poles, have a horizontal clearance rate of "[n]ot less than six inches measured to the street side of the curb." *Id.* at § 125.23(2)(b).

[10]This standard governs the field inspection of wood poles in order "to secure maximum life of poles," and sets forth an inspection procedure.

plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." ' *Luoni* v. *Berube*, 431 Mass. 729, 735 (2000), quoting W.L. Prosser & W.P. Keeton, Torts § 53, at 358-359 (5th ed. 1984). 'The assertion that liability must . . . be denied because defendant bears no duty to plaintiff "begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' *Tarasoff* v. *Regents of the Univ. of Calif.*, 17 Cal. 3d 425, 434 (1976), quoting *Dillon* v. *Legg*, 68 Cal. 2d 728, 734 (1968). '[A] duty finds its "source in existing social values and customs," ' see [*Mullen* v. *Pine Manor College*, 389 Mass. 47, 51 (1983)], quoting *Schofield* v. *Merrill*, 386 Mass. 244, 247 (1982), and thus 'imposition of a duty generally responds to changed social conditions.' *Petolicchio* v. *Santa Cruz County Fair & Rodeo Ass'n*, 177 Ariz. 256, 262 (1994).

"We have recognized that '[a]s a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.' See *Remy* v. *MacDonald*, *supra* at 677, citing Restatement (Second) Torts § 302 comment a (1965). A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. See *Foley* v. *Boston Hous. Auth.*, 407 Mass. 640, 646 (1990), quoting *Husband* v. *Dubose*, 26 Mass. App. Ct. 667, 669 (1988) ('There is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant'). See also *Husband* v. *Dubose*, *supra* (determination whether person has duty to protect other from harm caused by third party 'involve[s], to some extent, the foreseeability of the harm'). Consequently, with some important exceptions, 'a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' *Tarasoff* v. *Regents of the Univ. of Calif.*, *supra* at 434-435. See Restatement (Second) Torts § 284 (1965) ('Negligent conduct may be . . . an act which the actor as a reasonable man should *recognize* as involving an unreasonable risk of causing an invasion of an interest of another . . .' [emphasis added]). 'To the extent that a

legal standard does exist for determining the existence of a tort duty . . . , it is a test of the "reasonable foreseeability" of the harm.' McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1230 (2000) . . . ."

*Jupin* v. *Kask, supra* at 146-147. See *Whittaker* v. *Saraceno*, 418 Mass. 196, 198 (1994), quoting 4 F. Harper, F. James, Jr., & O. Gray, Torts § 20.5, at 136-137 (2d ed. 1986) ("Foreseeability does play a large part in limiting the extent of liability . . . . Notions about what should be foreseen, in other words, are very much interwoven with our feelings about fair and just limits to legal responsibility"); *Vaughan* v. *Eastern Edison Co.*, 48 Mass. App. Ct. 225, 229 (1999), quoting *White* v. *Southern Cal. Edison Co.*, 25 Cal. App. 4th 442, 447 (1994) (duty is "determined by balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed"). In this case, the plaintiffs contend that the utility defendants owed a duty to the motoring public, including Afarian, to exercise reasonable care in the placement of the pole. The plaintiffs argue that due to the proximity of the pole to the road, and the pole's location on the outside of a curve, the pole was placed in a dangerous position.

Not surprisingly, utility poles along roads have generated numerous cases dealing with a utility company's liability for personal injury when a vehicle collides with the utility pole. In determining whether to impose a duty, courts generally have followed two approaches. The first approach focuses on the driver's conduct. See, e.g., *Collier* v. *Redbones Tavern & Restaurant, Inc.*, 601 F. Supp. 927, 930-931 (D.N.H. 1985) (utility owed no duty to passenger in vehicle operated by drunk and speeding driver). The second approach involves an assessment of several factors. See *Coates* v. *Southern Md. Elec. Coop., Inc.*, 354 Md. 499, 514 (1999). The factors include driver conduct as well as the proximity of the pole to the road; the nature and condition of the road in the vicinity of the pole; whether the pole was to the right or left of the vehicle in the direction the vehicle should have been traveling; the extent to which the vehicle veered off the road; whether the pole had been struck on previous occasions; whether the location of the

pole was mandated by some governmental authority or left largely
to the discretion of the utility; whether the utility could feasibly
have located the pole elsewhere; and the cost and feasibility of
relocating the pole to a different location. See *id.* See also *Mc-
Millan* v. *State Highway Comm'n*, 426 Mich. 46, 64 (1998).[11]

The Restatement (Second) of Torts § 368 (1965) takes what
has been characterized as a "*somewhat* more liberal approach, by
recognizing the prospect of liability in certain settings for off-
road collisions" (emphasis in original). *Coates* v. *Southern Md.
Elec. Coop., Inc., supra* at 516. Section 368 concerns the liability
of owners or occupiers of land for artificial conditions created
thereon that cause injury to travelers on a nearby highway:

> "A possessor of land who creates or permits to remain
> thereon an excavation or other artificial condition so near
> an existing highway that he realizes or should realize that
> it involves an unreasonable risk to others accidentally
> brought into contact with such condition while traveling
> with reasonable care upon the highway, is subject to li-
> ability for physical harm thereby caused to persons who
> (a) are traveling on the highway,[12] or (b) foreseeably
> deviate from it in the ordinary course of travel."

Section 368 applies to all travelers, including drivers and
passengers. *Soares* v. *George A. Tomasso Constr. Corp.*, 66
Conn. App. 466, 474-475 (2001).

The comments to § 368 provide guidance about its
application. Comment e explains that "[t]he public right to use
the highway carries with it the right to protection by reasonable
care against harm suffered in the course of deviations which
may be regarded as *the normal incidents of travel*" (emphasis
added). Restatement (Second) of Torts, *supra* at 269. Comment
g clarifies that § 368 "has no application where the deviation

---

[11]Different variations of these approaches exist. For example, some courts
focus only on a single factor. See, e.g., *Weiss* v. *Holman*, 58 Wis. 2d 608, 627
(1973) (assessing duty only in terms of distance of pole from road). Some
courts also analyze a factor or factors in terms of determining the issue of
proximate cause for the collision. See *Coates* v. *Southern Md. Elec. Coop.,
Inc.*, 354 Md. 499, 514-515 (1999).

[12]The parties do not dispute that this subsection applies to collisions that
occur on the highway itself and, therefore, is not applicable.

[of the traveler from the highway] *is one not reasonably to be anticipated*, or *is for a purpose not normally connected with the travel*" (emphasis added). *Id.* at 270. With respect to the latter exclusion, "[t]he distinction is . . . between those which are normal incidents of travel and those which are not." *Id.*

In this case, the judge adopted more than one approach. She first concluded, applying § 368 of the Restatement (Second) of Torts, that the utility defendants owed no duty to Afarian because Veilleux had been driving while intoxicated, which is not a normal incident of travel. She then turned to, and applied, the *Coates* factors, ultimately concluding that, based on those factors, it was not foreseeable that Veilleux would strike the pole. Although we have not had occasion to consider the application of § 368, in circumstances such as those presented here, we believe that the principles it expresses provide a functional framework for determining the issue of duty. We conclude that because he was intoxicated, Veilleux cannot be said to have deviated from the road in the ordinary course of travel and his deviation, which was caused by intoxication, was not, and could not have been, reasonably anticipated. Accordingly, the utility defendants owed no duty to Afarian. We therefore do not reach the question whether the pole's placement created an unreasonable risk of harm to persons lawfully traveling on the road and to persons deviating from it in the ordinary course of travel.[13]

We adopt the approach set forth in § 368 of the Restatement because it comports with concepts of reasonable foreseeability and because a contrary decision would come effectively close to imposing strict liability on utility companies for all collisions with poles by drunk drivers. In view of our society's dependence on the services supplied by utility companies, and the public

---

[13]Contrary to the plaintiffs' contention, we are not relieving utility companies of a duty to consider motorist safety when determining the placement of utility poles, and we do not doubt that the Legislature is also concerned about the safe placement of utility poles. We decline to consider the plaintiffs' argument relying on G. L. c. 166, § 21, which provides that utility companies "shall not incommode the public use of public ways" when installing utility poles. The plaintiffs did not raise the issue of the application of this statute below. See *Porter* v. *Treasurer & Collector of Taxes of Worcester*, 385 Mass. 335, 338 n.5 (1982). We point out, however, that the pole's placement here was not on the actual public way.

benefit of receiving those services, see *Boylan* v. *Martindale,* 103 Ill. App. 3d 335, 344 (1982), quoting *Hoffman* v. *Vernon Township,* 97 Ill. App. 3d 721, 727 (1981), public policy favors some limitation on the liability of utility companies. A limitation in the narrow context of drunk drivers colliding with utility poles located off a road, and otherwise properly installed, recognizes that utility companies should not be required to exercise extraordinary (rather than ordinary) care with respect to a remote risk, and that they should not be required to determine pole placement based on the conduct of society's most irresponsible citizens who alone make the decision to become impaired and to break the law.

While it can be said that, no matter the number, there are far too many drunk driving accidents, one does not typically encounter drunk drivers in the ordinary course of day-to-day travel. While a driver may deviate from a public road for a variety of reasons — some deviations caused by lawful conduct and other deviations caused by unlawful conduct — driving while intoxicated is a most serious, and many times fatal, deviation. A utility company does not ordinarily have any involvement with a driver's decision to become impaired. Utility companies have no way of anticipating the road on which a drunk driver will travel, the exact place of deviation from that road, and the particular pole that will be struck. Driving while intoxicated does not constitute a normal incident of travel. A deviation by a drunk driver cannot reasonably be anticipated by a utility company.

Our conclusion is supported by decisions from other jurisdictions. See *Collier* v. *Redbones Tavern & Restaurant, Inc.,* 601 F. Supp. 927, 930-931 (D.N.H. 1985) (defendants owed no duty to passenger in vehicle operated by drunk and speeding driver because such erratic and uncontrolled deviation not normal incident of travel); *Speigel* v. *Southern Bell Tel. & Tel. Co.,* 341 So. 2d 832, 833 (Fla. Dist. Ct. App. 1977) (affirming summary judgment for utility company, noting utility company has no obligation to guard against extraordinary exigencies created when out-of-control vehicle leaves travel portion of road); *Bush* v. *Northern Ind. Pub. Serv. Co.,* 685 N.E.2d 174, 178 (Ind. Ct. App. 1997) (utility is not required to

anticipate "the illegal and reckless conduct of motorists''); *Oram* v. *New Jersey Bell Tel. Co.*, 132 N.J. Super. 491, 493-495 (1975) (summary judgment in favor of utility company appropriate where driver hit pole two feet from road after being forced off road by other driver because utility company "need only anticipate ordinary travel," i.e., vehicle's staying on road); *Gorrell* v. *Texas Utils. Elec. Co.*, 915 S.W.2d 55, 60 (Tex. Ct. App. 1995) (summary judgment in favor of utility affirmed where driver was not traveling with reasonable care and her deviation not in ordinary course of travel); *McAllen* v. *De La Garza*, 898 S.W.2d 809, 810, 812 (Tex. 1995) (intoxicated driver who fell asleep at wheel did not deviate from road in ordinary course of travel). See also *Florida Power & Light Co.* v. *Macias*, 507 So. 2d 1113, 1115-1116 (Fla. Dist. App. Ct. 1987) (adopting rule that "the chance that a vehicle in the ordinary course of travel will deviate from the roadway and collide with a pole is only a remote possibility," and to recover, plaintiff "must present some evidence which indicates a particularly dangerous condition which would make it likely, and thus foreseeable, that vehicles would deviate from the roadway and collide with the particular pole alleged to have been negligently maintained'').

As has been stated, our conclusion further comports with the principles of reasonable foreseeability. While it is foreseeable that some drivers will drive in an intoxicated state, it is not foreseeable when, and exactly where, that illegality will occur. See *Schrader* v. *Great Plains Elec. Coop., Inc.*, 19 Kan. App. 2d 276, 280 (1994) (utility company owed no duty to motorist killed in collision with off-road guy wire because it was not reasonably foreseeable that motorist would stray from road and collide with guy wire); *Beck* v. *Zabrowski*, 168 Pa. Commw. 385, 394-395 (1994) (affirming summary judgment in favor of utility where it was not reasonably foreseeable that driver, who was intoxicated and speeding while fleeing from police without aid of headlights, would drive in wrong lane, make sharp turn into another roadway, and then strike pole located eight inches from roadway on opposite side of road).[14]

2. *Motion to amend.* The plaintiffs filed their original

---

[14]Our conclusion obviates the need to address the plaintiffs' argument

complaint on April 23, 1999. They later amended it, on July 28, 1999, to assert claims of wrongful death predicated on negligence, gross negligence, and wilful or reckless conduct against Market Basket. The plaintiffs alleged that, before the fatal crash (which, as has been stated, took place on July 28, 1996), Market Basket negligently sold several cases of beer to Veilleux's underage friend, Daniels, and Veilleux had consumed some of this beer.

In the plaintiffs' pretrial memorandum filed in 2004, they more specifically set forth their allegations and theory of liability on the issue of the negligent sale of alcohol. The decedent was not involved in the purchase of the alcohol. On the morning of July 27, 1996, Veilleux, Sean Croteau, and Daniels, all underage, drove to a supermarket on Route 28 in Salem, New Hampshire. They entered the store together and proceeded to the beer and wine section located to the far left, in the front of the store. They selected three thirty-can cases of beer and placed them in a shopping cart. They discussed which of the checkout employees appeared to be the youngest. One of the boys pointed to a particular checkout line. Daniels, who had his older brother's identification, purchased the beer. Croteau remained in the store and Veilleux left the store. They regrouped in the parking lot. The plaintiffs claimed that the supermarket violated its own procedures, industry standards, and New Hampshire statutory law by negligently selling beer to Daniels in circumstances where the cashier and supervisory personnel should have known he was underage and was buying the beer for his underage friends.

In May, 2004, in preparation for a mediation with Market Basket, counsel for the plaintiffs discovered, by visiting the Market Basket supermarket at issue with Veilleux, that the beer consumed by Veilleux had not been purchased at the Market Basket store, but rather, at a different supermarket that was owned by Demoulas and, that at some point in time, bore the sign "Demoulas."[15] The Demoulas store is located approximately within one mile of the Market Basket store (which

concerning the application of the statute of repose, G. L. c. 260, § 2B.

[15]At his deposition in December, 1999, Jason Veilleux stated that he, Peter Daniels, and Sean Croteau purchased the beer (with Daniels making the actual purchase) at a Market Basket store on Route 28 in Salem, New Hampshire.

bore the sign "Market Basket"), and both stores are located on Route 28 in Salem, New Hampshire. Claiming that the Market Basket store is indistinguishable from the Demoulas store because the former store has always, including in July, 1996, been managed and financed by Demoulas, and noting that in 1997, Market Basket stores were merged into Demoulas stores, the plaintiffs, on June 16, 2004, moved to amend their complaint to add Demoulas "as the correct defendant."[16] Demoulas filed a limited appearance to oppose the motion, and was represented by the same counsel who represented Market Basket.

As the named defendants had filed answers to the first amended complaint, it fell within a judge's discretion to allow or to deny the plaintiffs' motion to amend.[17] Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974). See also G. L. c. 231, § 51; *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 289 (1977). Consistent with "our liberal practice as to amendments," *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp.*, 344 Mass. 420, 423 (1962), "[t]he expressed tendency is in favor of allowing amendments, and a motion to amend should be allowed unless some good reason appears for denying it." *Castellucci* v. *United States Fid. & Guar. Co.*, *supra*. Such reasons include undue delay, as well as prejudice to the opposing party. See *Goulet* v. *Whitin Mach. Works, Inc.*, 399 Mass.

Veilleux testified *in response* to a question posed by the plaintiffs' counsel that asked, "Was [the checkout counter] near the beer side of the store, which I understand when you walk in it's on the left?" Veilleux responded that he did not remember, and gave no testimony regarding where the beer and wine department was located. In fact, the beer and wine department at the Market Basket store was located in the right side of the building, but that same department at the Demoulas store was located in the left side of the store. When called to testify at a deposition, Daniels invoked his privilege under the Fifth Amendment to the United States Constitution. Croteau was never located by any party and, consequently, was not deposed.

[16]The plaintiffs did not challenge that in July, 1996 (the time of the alcohol purchase), the two supermarkets were owned by separate corporate entities, namely, Market Basket and Demoulas.

[17]The plaintiffs challenged the judge's order by filing a petition for interlocutory relief pursuant to G. L. c. 231, § 118. A single justice of the Appeals Court denied relief, concluding that there was no error of law or abuse of discretion. Prior to filing their notice of appeal from the judge's denial of their motion to amend, the plaintiffs moved to dismiss their claims against Market Basket. The motion was allowed and judgment entered dismissing the plaintiffs' claims against Market Basket.

547, 552 (1987); *Castellucci* v. *United States Fid. & Guar. Co.*, *supra* at 292.

In the present case, the judge applied correct legal principles and acted within her discretion in denying the motion. The proposed amendment was not merely an inconsequential name correction such as that in *Potter* v. *John Beam Div. of Food Mach. & Chem. Corp.*, *supra* at 424. The amendment involved a change of fact, namely, that the alcohol purchase took place at an entirely *different store* (bearing a different name and having a different location). Even assuming that Demoulas, at the time of the alcohol purchase in 1996, controlled, managed, and financed Market Basket, that factual assumption has no bearing on what was the determinative issue for the judge — prejudice caused by undue delay. As the judge noted, Demoulas "would have great difficulty when attempting to determine who worked at the store on the day of . . . the alleged illegal sale [many] years ago and when attempting to gather relevant evidence." Indeed, the plaintiffs did not dispute evidence submitted by Demoulas that, prior to the 1997 merger of Market Basket and Demoulas, each of the entities had its own set of employees.

Further, the judge was warranted in determining that the plaintiffs reasonably should have known "long before" moving to amend the complaint from which store the alcohol was purchased. In view of the difficulties the plaintiffs were having with obtaining witness cooperation, and the plaintiffs' knowledge from Market Basket's answers to interrogatories in June, 2002, that there remained an issue regarding where the alcohol had been purchased, if the plaintiffs had concerns that the Market Basket store may not have been the store at which the alcohol had been purchased, they could have physically inspected the store earlier (or attempted other discovery on their own or with the aid of the court). As the burden of proof fell on the plaintiffs, it was not the obligation of Market Basket to ascertain the store at which the alcohol had been purchased.

It cannot be said that the judge abused her discretion in denying the motion to amend.

3. *Conclusion.* The orders allowing the utility defendants'

motions for summary judgment are affirmed. The order denying the plaintiffs' motion to amend is affirmed.

*So ordered.*