Commerce Insurance Company *vs.* Ultimate Livery Service, Inc., & others[1] (and four companion cases[2]).

Suffolk. September 2, 2008. - November 26, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Negligence,* Serving alcoholic liquors to guest, Social host, Duty to prevent harm, Foreseeability of harm. *Alcoholic Liquors,* Liability of host, Motor vehicle. *Public Policy. Insurance,* Motor vehicle insurance, Construction of policy. *Indemnity. Motor Vehicle,* Insurance. *Words,* "Arising out of," "Resulting from."

In tort and wrongful death actions arising from an automobile accident caused by an intoxicated driver who had attended a private bachelor party prior to the incident, the judge properly granted summary judgment on the plaintiffs' social host liability claim in favor of the defendants (a private carrier and its employee, who were hired to provide transportation for members of the party), where there was no evidence that the defendants had provided or served the alcohol that was consumed by the intoxicated driver while a passenger in the insured's vehicle [645-646]; however, the judge erred in granting summary judgment in favor of the defendants on the plaintiffs' negligence claims, in circumstances where the defendants owed a duty to the plaintiffs to avoid discharging a passenger who they knew, or should have known, was intoxicated and likely to drive an automobile [646-651]. Cordy, J., concurring, with whom Marshall, C.J., and Botsford, J., joined.

In a dispute regarding the coverage provided by commercial automobile and business owners insurance policies for social host liability and negligence claims brought against the insured (a private carrier) by third parties injured in an automobile accident caused by an intoxicated passenger discharged by the insured, this court concluded that the commercial automobile policy provided coverage and imposed on the insurer a duty to indemnify the insured for the third-party claims, where the injuries of the third parties arose out of the use of a motor vehicle as defined by the policy (i.e., a van that was used consistently with the insured's business objectives, namely, to permit passengers to get intoxicated while the insured provided transportation service) [652-655]; however, coverage under the

---

[1]Richard Broderick; Lillie Paquette; Sharlene Waters, administratrix of the estate of Sean Waters; Brian Powers; James Podolske; Amber Seaton; Gennes J. Seaton; and Linda E. Stevens.

[2]Lillie Paquette *vs.* Ultimate Livery Service, Inc., & others; Amber R. Seaton & others *vs.* Ultimate Livery Service, Inc., & others; James Podolske & another *vs.* William Powers & others; Sharlene N. Waters, administratrix, *vs.* Ultimate Livery Service, Inc., & others.

business owners policy was barred by language expressly excluding claims arising out of the use of any automobile operated by the insured [655-656].

CIVIL ACTIONS commenced in the Superior Court Department, one each on July 28 and July 30, 2004, and three on August 11, 2004.

After consolidation of certain tort and insurance coverage claims, the case was heard by *Patrick F. Brady*, J., on motions for summary judgment, and entry of separate and final judgments on the tort claims was ordered by *Thomas E. Connolly*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael B. Bogdanow* for Sharlene Waters.

*Kenneth F. Rosenberg* for Ultimate Livery Service, Inc., & another.

*John F. Hurley, Jr.*, for Commerce Insurance Company.

*Darin L. Wessel*, for Taxicab, Limousine & Paratransit Association, amicus curiae, submitted a brief.

GREANEY, J. In the early morning of August 12, 2001, several people were seriously injured, and one man killed, in an automobile accident caused by an intoxicated driver, William Powers (Powers).[3] Powers, along with five other men, had attended a bachelor party prior to the accident. To get to the party, the group hired a private carrier, Ultimate Livery Service, Inc. (Ultimate),[4] which drove them from a sports bar in the South

---

[3]We shall refer to William Powers as "Powers" and to Brian Powers, Powers's brother, as "Brian."

[4]Ultimate is a private carrier. A "private carrier is one who holds himself out as ready to furnish transportation for hire only to those with whom he chooses to deal in accordance with such contracts as he makes with them." *First Nat'l Stores Inc.* v. *H.P. Welch Co.*, 316 Mass. 147, 149 (1944). A private carrier is distinguished from a common carrier. The latter "is one who holds himself out to the public as one willing to furnish his facilities for the transportation of goods or persons indiscriminately to all who apply to him for the rendition of such services, up to the extent of his facilities, upon the payment of reasonable compensation." *Id.* A common carrier "is required to exercise the utmost care consistent with the nature and extent of its business to carry its passengers to their destination in security and enable them to alight there with safety." *Glennen* v. *Boston Elevated Ry.*, 207 Mass. 497, 498 (1911). The "highest degree of care" is imposed on common carriers because passengers have little control over the operation of their transport, the actions

Boston section of Boston to a "strip club" in Rhode Island, and then back to the sports bar. When the group was returned to the sports bar by Ultimate's driver, Richard Broderick, Powers, joined by two of his friends who had attended the party, got into an automobile loaned to Powers by his girl friend and, with Powers driving, left the bar. The automobile never made it to the intended destination, and instead was involved in a violent intersection collision.

A wrongful death action was brought by the estate of Sean C. Waters (an off-duty Boston police officer who had been a passenger in the other automobile), and tort actions were brought by the injured occupants of both automobiles (collectively, tort action or tort claims). Some of the tort claims assert that Ultimate and Broderick negligently furnished alcohol to Powers (social host theory of liability or social host liability claims). Other claims (wrongful death and negligence claims) assert that Ultimate and Broderick were negligent in permitting Powers to leave the van at the Boston bar when they knew, or should have known, that Powers was likely to operate an automobile while intoxicated (negligence claims).

In addition to the tort action, Ultimate's insurer, Commerce Insurance Company (Commerce), filed a complaint seeking a declaratory judgment that neither of the two policies it had issued to Ultimate provides coverage for the injuries of the plaintiffs in the tort action (insurance coverage action or insurance coverage claims). The tort action and the insurance coverage action were consolidated.

A Superior Court judge granted summary judgment in favor of Ultimate and Broderick on all the tort claims, concluding that (1) no social host liability existed because there was no evidence that Ultimate or Broderick had provided alcohol to Powers; and (2) Ultimate and Broderick owed no duty to the plaintiffs to protect them from the conduct of an intoxicated passenger once the passenger was returned to the drop-off point. Separate and final judgments, pursuant to Mass. R. Civ. P. 54 (b), 365

of the employees, the conduct of the business, and their own safety. *Holton* v. *Boston Elevated Ry.*, 303 Mass. 242, 244 (1939). As to private carriers, the ordinary rules of negligence apply, not the heightened duty of care that applies to common carriers. *Houle* v. *Lewonis*, 245 Mass. 254, 255 (1923).

Mass. 820 (1974), entered dismissing the tort claims against Ultimate and Broderick.[5] In the insurance coverage action, a judgment entered declaring that (1) Commerce's business owner policy did not provide coverage for the plaintiffs' claims in the tort actions; (2) Commerce is required under its automobile policy to defend and indemnify Ultimate with respect to the social host liability claims; and (3) Commerce is not required under its automobile policy to indemnify Ultimate with respect to the negligence claims that are based on discharging Powers in an intoxicated state.

The plaintiffs in the tort action (plaintiffs) appealed. Commerce filed a cross appeal with respect to its obligation under the automobile policy to defend and indemnify Ultimate on the social host liability claims. We transferred the cases here on our own motion to determine whether (1) Ultimate and Broderick owed a duty to the plaintiffs to avoid discharging its intoxicated passenger at a location from which it was likely he would drive; and (2) Commerce is required to cover the claims made in the tort action under either of its two policies issued to Ultimate. We conclude that such a duty exists, and that the commercial automobile policy provides coverage for the plaintiffs' claims in the tort action.

The relevant facts established for summary judgment purposes are contained in statements, depositions, and other materials in the record. In setting out the facts, we resolve any conflicts in the summary judgment materials, and we make all logically permissible inferences, in favor of the plaintiffs in the tort actions. *Ulwick* v. *DeChristopher*, 411 Mass. 401, 402 (1991). During the evening of August 11, 2001, Powers was part of a group of men who rented a vehicle from Ultimate for the purpose of obtaining transportation for the members of a bachelor party. The arrangements were made by Brian Masse, also a member of the bachelor party, through his friend Broderick, who was a driver for Ultimate and would drive the vehicle on the evening of the party. The men engaged Ultimate because they planned to drink and wanted someone else to drive so they "wouldn't have to worry about driving home." The group consisted of

---

[5]In the tort action, other claims had been asserted against other parties.

Powers, Powers's brother Brian, James Podolske, Masse, Kenny Lee, and the groom, Anthony McNeil.

Among other activities, Ultimate provides transportation services for social events, including bachelor parties. Ultimate's owner, Robert Landry, expected that passengers transported during social occasions would become intoxicated. Landry understood that the use of the service by intoxicated persons reduced the risk to those persons, as well as to the general public, of being injured or killed in an automobile accident caused by drunk driving. Landry expected his drivers to drop off passengers at a safe location. He did not expect his drivers to handle intoxicated persons any differently from sober ones. If Broderick thought a passenger was intoxicated, he would drive him home.

Ultimate permitted its passengers to provide their own alcohol and to consume it in its vehicle and had no restrictions on the amount, or type, of alcohol its passengers could provide for themselves or consume. Ultimate did not have any policies, guidelines, or training for its drivers to make them aware of the extent of passenger alcohol consumption.

Masse arranged for the members of the bachelor party to be picked up and dropped off at the same location, namely, the Sports Connection in South Boston. After being picked up, Broderick would drive them to the strip club in Rhode Island, and he would later return them to the Sports Connection.

Powers drove the automobile of his girl friend to the Sports Connection on the evening of the party.[6] With him were Brian and Podolske. The men arrived at the bar between 6 and 6:30 P.M. Powers parked the automobile beside the bar. The men went inside the bar, where Powers drank as many as seven beers and two "woo-woos" (an alcoholic beverage containing peach schnapps, vodka, and cranberry juice).

Broderick arrived at the bar at approximately 8 P.M. He was operating a fifteen-passenger van owned by Ultimate. Broderick went inside the bar, learned that all members of the bachelor

---

[6]The home of Powers's mother was a five-minute walk from the bar. Powers's girl friend understood that he would not be driving her automobile home, but rather was planning to leave the keys in the automobile for her to pick up later.

party were present, and observed that everyone in the party had been drinking. Broderick stayed inside the bar for about fifteen minutes, while the men "finish[ed] up what they were drinking." The members of the bachelor party were intent on getting drunk and having a good time.

Shortly after the group left the bar, Masse asked Broderick to stop at a liquor store. Broderick took them to a nearby liquor store and accompanied Masse and one of the other passengers into the store. Either Masse or the other passenger, or both men together (but not Broderick), purchased at least one thirty-pack of beer, some ice, and a cooler, all of which was loaded into the van.[7] The passengers drank some of the beer in the van on the way to the Rhode Island club. Powers consumed three or four beers in the van.

The group arrived at the club at about 9 P.M., where the men continued to drink. Powers consumed three beers or more and up to two "shots." Broderick was in the club and saw members of the bachelor party drinking. At approximately 1 A.M. on August 12, the men boarded the van to return to Boston. Once inside, they continued to drink beer with Powers consuming another three "or so" beers.

The group arrived at the Sports Connection at about 2:10 A.M. Broderick parked the van by the curb outside the bar, which was closed and dark with no one else around. A nearby subway station was closed. About ten minutes later, Broderick left with Masse and Lee in the van. The other passengers had left the van. Broderick took Masse and Lee to another party which Broderick planned to attend. Before leaving, Broderick did nothing to determine whether the passengers were capable of getting home on their own.[8]

Powers, along with his brother and Podolske, returned to the automobile of Powers's girl friend. Powers drove and shortly thereafter, his automobile violently collided with an automobile operated by Lillie Paquette. The passengers of Paquette's vehicle

[7]An additional thirty-pack of beer and some hard liquor also may have been purchased.

[8]Ultimate and Broderick assert that, before Broderick left, he asked the others whether they wanted other transportation, including whether they needed a ride home. The plaintiffs dispute this assertion.

were Waters, Linda Stevens, Amber Seaton, and Gennes Seaton. Occupants of both automobiles incurred very serious injuries. Waters died. Powers was transported to a nearby hospital. A toxicology screen of Powers's blood, taken at 3:55 A.M., established his blood alcohol level at three times the legal limit.

At the time of the accident, Ultimate had two polices of insurance with Commerce, a commercial automobile policy and a business owners policy. The commercial automobile policy, with limits of $1,000,000, provides liability coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " The van used to transport the bachelor party is a covered "auto" under the policy. The automobiles operated by Powers and Paquette, which were involved in the collision, are not covered "autos" under the policy.

The business owners policy, having single limits of $1,000,000, is a general liability policy. The policy contains an indorsement entitled "Limitation of Coverage to Designated Premises or Project" (premises indorsement). The premises indorsement provides in pertinent part: "This insurance applies only to 'bodily injury' . . . arising out of . . . [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises . . . ." The designated "premises" shown on the policy is "287 Columbus Ave. Boston." The business owners policy excludes coverage for bodily injury "arising out of the ownership, maintenance, use or entrustment to others of any . . . auto . . . owned or operated by or rented or loaned to any insured" (exclusion).

1. *The tort claims.* a. *Social host liability claims.* On appeal, the plaintiffs conflate their social host liability claims with their negligence claims that are based on the alleged duty of Ultimate and Broderick to protect them from the conduct of an intoxicated driver. The claims are distinct. The plaintiffs argue that summary judgment was erroneously granted to Ultimate and Broderick on the social host liability claims because there was evidence to support the claims. They point solely to the interrogatory answer of Podolske stating that the van "already had alcohol in it" when he

first entered.[9] This evidence is insufficient to support the social host liability claims against Ultimate and Broderick on summary judgment.

"[I]n numerous social host cases, we have held that a social host is not liable to a person injured as a result of a guest's excessive consumption of alcohol that was not owned or furnished by the host." *Burroughs* v. *Commonwealth*, 423 Mass. 874, 878 (1996), and cases cited. There was no evidence that Powers consumed any alcohol that "already" had been in the van. Rather, the evidence was that Powers consumed alcohol purchased at the Sports Connection and at the Rhode Island club and, in the van, drank beer purchased from a liquor store. There was no showing that these purchases were made by Ultimate or Broderick. There is no evidence, therefore, that Ultimate or Broderick provided or served Powers with the alcohol he consumed. The judge correctly granted summary judgment in favor of Ultimate and Broderick on the social host liability claims. See *Ulwick* v. *DeChristopher*, 411 Mass. 401, 402, 403 (1991).

b. *Negligence claims.* The negligence claims are based on the existence of a duty owed by Ultimate and Broderick (tort defendants) to the plaintiffs. The tort defendants correctly cite authority for the proposition that a common carrier's duty to its passengers terminates once they have safely disembarked. *Bettencourt* v. *Massachusetts Bay Transp. Auth.*, 1 Mass. App. Ct. 847, 848 (1973), and cases cited. As to "common carriers," Restatement (Second) of Torts § 314A comment c (1965) sets forth this same principle: "A carrier is under no duty to one who has [safely] left the vehicle and ceased to be a passenger . . . ."

We are not concerned with a common carrier, but rather are concerned with a private carrier for hire. Whether the tort defendants owed a duty is a question of law to be determined by this court. In deciding the question, we take into account social conditions and contemporary public policy concerns. See *Jupin* v. *Kask*, 447 Mass. 141, 146-147 (2006). We conclude, in the circumstances of this case, that the tort defendants owed a duty

---

[9]Four months after answering the interrogatory, Podolske testified at his deposition that he could not remember whether there was alcohol inside the van when he first entered. His lack of recall, however, is not tantamount to a "repudiat[ion]" of his prior statement.

of reasonable care to avoid discharging a passenger, who they knew, or should have known, was intoxicated and likely to drive an automobile.[10]

In the *Jupin* case, we set forth the principles for determining the existence of a duty:

> " 'The concept of "duty" . . . "is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." ' *Luoni* v. *Berube*, 431 Mass. 729, 735 (2000), quoting W.L. Prosser & W.P. Keeton, Torts § 53, at 358-359 (5th ed. 1984). 'The assertion that liability must . . . be denied because defendant bears no duty to plaintiff "begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' *Tarasoff* v. *Regents of the Univ. of Cal.*, 17 Cal. 3d 425, 434 (1976), quoting *Dillon* v. *Legg*, 68 Cal. 2d 728, 734 (1968). '[A] duty finds its "source in existing social values and customs," ' see [*Mullins* v. *Pine Manor College*, 389 Mass. 47, 51 (1983)], quoting *Schofield* v. *Merrill*, 386 Mass. 244, 247 (1982), and thus 'imposition of a duty generally responds to changed social conditions.' *Petolicchio* v. *Santa Cruz County Fair & Rodeo Ass'n*, 177 Ariz. 256, 262 (1994).

> "We have recognized that '[a]s a general principle of tort law, every actor [and person who fails to act] has a duty to exercise reasonable care to avoid physical harm to others.' See *Remy* v. *MacDonald*, [440 Mass. 675, 677 (2004)], citing Restatement (Second) of Torts § 302 comment a (1965). A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. See *Foley* v. *Boston Hous. Auth.*, 407 Mass. 640, 646 (1990), quoting *Husband* v. *Dubose*, 26 Mass.

---

[10]A few decisions of other State courts (not all rendered by the highest appellate court) are to the contrary. See, e.g., *McGettigan* v. *Bay Area Rapid Transit Dist.*, 57 Cal. App. 4th 1011, 1020 (1997); *Mastriano* v. *Blyer*, 779 A.2d 951, 956 (Me. 2001); *Knoud* v. *Galante*, 696 A.2d 854, 858 (Pa. Super. Ct. 1997). The issue, however, has not been addressed by many courts.

App. Ct. 667, 669 (1988) ('There is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant'). See also *Husband* v. *Dubose, supra* (determination whether person has duty to protect other from harm caused by third party 'involve[s], to some extent, the foreseeability of the harm'). Consequently, with some important exceptions, 'a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' *Tarasoff* v. *Regents of the Univ. of Calif., supra* at 434-435. See Restatement (Second) Torts § 284 (1965) ('Negligent conduct may be . . . an act which the actor as a reasonable man should *recognize* as involving an unreasonable risk of causing an invasion of an interest of another . . .' [emphasis added]). 'To the extent that a legal standard does exist for determining the existence of a tort duty . . . it is a test of the "reasonable foreseeability" of the harm.' McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1230 (2000)."

*Jupin* v. *Kask, supra* at 146-147. See *Whittaker* v. *Saraceno*, 418 Mass. 196, 198 (1994), quoting 4 F. Harper, F. James, Jr., & O. Gray, Torts § 20.5, at 136-137 (2d ed. 1986) ("Foreseeability does play a large part in limiting the extent of liability. . . . Notions about what should be foreseen, in other words, are very much interwoven with our feelings about fair and just limits to legal responsibility"); *Vaughan* v. *Eastern Edison Co.*, 48 Mass. App. Ct. 225, 229 (1999), quoting *White* v. *Southern Cal. Edison Co.*, 25 Cal. App. 4th 442, 447 (1994) (duty "determined by balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed").

The *Jupin* case involved a situation where the tort defendants were held to owe a duty to the plaintiff to secure a handgun that was used by a third party to shoot and kill the plaintiff's son, a police officer. The failure to perform the duty could be found to constitute negligence that would render the defendants liable in damages. Like this case, the duty imposed on the defendants concerned precautions that should have been taken by them to prevent the harm that was inflicted by a third party. We shall decide this case under the well-established principles stated in

the *Jupin* case, and, consequently, we see no need to examine the arguments of the parties on whether the so-called special relationship test applies.[11]

Society, for some time, has been gravely concerned with the tragic consequences of drunk driving. *McGuiggan* v. *New England Tel. & Tel. Co.*, 398 Mass. 152, 161 (1986). The concern has been manifested over the years in both legislation and case law. *Id.* See *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 500 (1968). Our decisions have primarily dealt with the liability of commercial suppliers and social hosts for injuries to third parties caused by drunk drivers. See *McGuiggan* v. *New England Tel. & Tel. Co.*, *supra* at 157. We have not, however, limited liability to persons and entities in those specific categories. We have also held that, where the general nature of the harm that occurred is foreseeable, it is not of consequence that the identity of an injured plaintiff is not specifically known to the defendant. See *Jupin* v. *Kask*, *supra* at 149-150 n.8; *Adamian* v. *Three Sons, Inc.*, *supra* at 500-501.

In this case, a jury could find that Ultimate should have foreseen the risk of what actually happened. Ultimate and Broderick permitted alcohol to be consumed in the van and transported intoxicated persons. Broderick went into the Sports Connection and saw Powers and the others drinking. Broderick took the men to a liquor store so they could purchase alcohol. Broderick was also in the Rhode Island club for a few minutes. Broderick knew, or should have known, that Powers was intoxicated, yet he allowed Powers to make his own judgment about driving, failing to

---

[11]The special relationship test is explained in *Irwin* v. *Ware*, 392 Mass. 745, 756 (1984).

The Restatement (Third) of Torts: Liability for Physical Harm § 40 comment i, at 758 (Proposed Final Draft No. 1, 2005), addresses the application of the special relationship test in the area involved in this case: "In addition to common carriers, others who transport the public may be subject to the affirmative duty provided in this Section. Thus, airport-shuttle vans, courtesy vans, and limousines that are available to transport members of the public are subject to a duty of reasonable care." Although comment f, *id.* at 755, states that "no affirmative duty [is imposed] on a common carrier to a person who left the vehicle and is no longer a passenger," the Reporters' Note to comment i, *id.* at 768, expressly notes that there is "very little decisional law about the affirmative duties of transporters *other than* common carriers" (emphasis added). The Restatement thus appears to leave the development of tort law in the area to decision under settled common-law principles.

take any reasonable precautions to prevent him from doing so. A jury could conclude that Ultimate and Broderick were negligent when they left Powers at a location where he would likely drive and pose an extreme danger to the public.[12] We emphasize, however, that our finding of possible liability in this case is limited to the facts described above and our holding that a duty exists on these facts does not signal that liability may be found in cases involving other private carriers for hire with dissimilar facts.

Our conclusion does not absolve Powers from personal responsibility. His conduct will be a factor for the jury to consider in deciding whether Ultimate's and Broderick's duty was violated, and in determining causation. We do not conclude, as the tort defendants urge, that Powers's conduct is the sole consideration in the assessment of a duty. Cf. *McGuiggan* v. *New England Tel. & Tel. Co.*, *supra* at 155-156, quoting *Nehring* v. *LaCounte*, 219 Mont. 462, 471 (1986) (in terms of causation rejecting "Neanderthal" view that drinker's voluntary consumption alone is proximate cause of third party's injury). Cf. *Adamian* v. *Three Sons, Inc.*, *supra*. A private carrier, like Ultimate, which transports intoxicated persons can reasonably foresee that passengers such as Powers may not be fully capable of making rational decisions about their ability to drive. See *Marshall* v. *Van Meter*, 438 S.W.2d 504, 506 (Ky. 1969) (imposing higher duty of care on carrier

---

[12] Our conclusion is strengthened by the so-called "open container law," G. L. c. 90, § 24I, which makes it unlawful to possess, "upon any way or in any place to which the public has a right of access[,] . . . an open container of alcoholic beverage" in the "passenger area" of a motor vehicle. The statute provides an exception for "the passengers of a motor vehicle designed, maintained and used for the transportation of persons for compensation." G. L. c. 90, § 24I (*c*).

Ultimate operates its business lawfully under the exception to the open container law. The Legislature could not have intended that the exception would immunize Ultimate against liability in the circumstances that a jury could find here. The purpose of the exception is to allow Ultimate to transport its passengers with the safe, responsible, and reasonable consumption of alcoholic beverages. However, Ultimate (through Broderick) knew, or should have known, that Powers was thoroughly intoxicated from the consumption of alcohol within, and outside of, the van, thus acting in contravention of the purpose of the exception.

We also point out that the duty we hold to exist is limited to a commercial and contractual arrangement for hire that makes the case dissimilar (for that factor and others) from *Cremins* v. *Clancy*, 415 Mass. 289 (1993).

who transports intoxicated passenger). See also *Mastriano* v. *Blyer*, 779 A.2d 951, 957 (Me. 2001) (Wathen, C.J., dissenting, with whom Dana, J., joined).

We reject the tort defendants' argument that public policy requires that no duty be imposed because finding a duty may cause private carriers to refuse to transport intoxicated persons, thereby allowing more drunk drivers to drive. See *Remy* v. *MacDonald*, 440 Mass. 675, 677 (2004). The dangers of drunk driving, both to intoxicated drivers, passengers in their vehicles, the motoring public, and those lawfully on the highways, have been abundantly documented in terms of "waste of human life," the likelihood of serious injury, and the enormous costs to society. *Adamian* v. *Three Sons, Inc.*, *supra* at 501. See *Irwin* v. *Ware*, 392 Mass. 745, 756 (1984). Drunk driving is an egregious violation of public safety against which the public, and public safety officers, cannot guard completely. *Id.* See *Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. 257, 266 (2007). A drunk driver in his automobile becomes akin to a lethal weapon on the highways in terms of the destruction that can be inflicted. A private carrier, engaged in the business of transporting persons consuming alcohol, is in a primary position to use care to avoid leaving an intoxicated passenger at a location where it is likely the passenger will drive. Broderick himself understood the danger, and previously had dropped off intoxicated passengers at their homes. Public policy does not condone what occurred here, but instead strongly supports the imposition of a duty.

Ultimate, as a commercial enterprise profiting from its business (and the behavior of its passengers), is in the best position to remedy problems, and it should be expected to have in place safeguards that would, to the extent feasible, keep intoxicated drivers off the roads. The burden imposed on Ultimate, and other private carriers, is not impracticable. Concerns voiced by Ultimate over possible limitations of insurance coverage and higher premiums for coverage were issues faced years ago by commercial vendors of alcohol, and were adequately dealt with to the satisfaction of concerned parties. When facts exist such as those described here, the business interests of private carriers must be subordinated to the needs of public safety. Summary judgment on the negligence claims must be vacated.

2. *The insurance coverage claims.* We turn to whether there is coverage for the plaintiffs' injuries under the terms of the two policies issued by Commerce. The interpretation of an insurance policy is a question of law to be reviewed de novo. *Chenard* v. *Commerce Ins. Co.*, 440 Mass. 444, 445 (2003). Because the language of the standard Massachusetts automobile policy is set by the Commissioner of Insurance, the commercial automobile policy "is exempt from the rule of construction requiring ambiguities to be resolved against the insurer." *Id.* at 445-446. That language is to "be construed in its usual and ordinary sense." *Id.* at 446. The policy must also be considered "with reference to the customs of the trade or course of business respecting which it is issued." *City Fuel Corp.* v. *National Fire Ins. Co.*, 446 Mass. 638, 639 (2006), quoting *Koshland* v. *Columbia Ins. Co.*, 237 Mass. 467, 472 (1921). "The insurer is charged with notice of such [business] practices and his liability is to be determined in that light." *Koshland* v. *Columbia Ins. Co.*, *supra*.

We first examine whether the commercial automobile policy obligated Commerce to indemnify Ultimate with respect to the social host liability and negligence claims.[13] The commercial automobile policy provides liability coverage for "bodily injury . . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " With respect to the social host liability claims, the judge found that the complaints alleged a situation where the van was used to serve alcohol. The judge concluded, therefore, that Commerce was charged under the policy with a duty to indemnify the plaintiffs with respect to the social host liability claims. With respect to the negligence claims, however, the judge determined that no duty to indemnify existed. He reasoned that the fact "[t]hat Powers and the others may have consumed some alcohol[,] which they brought into the van[,] [did] not [constitute] a use of the van which would be covered." Commerce appeals from the judge's determination on the social host liability claims; the plaintiffs challenge the judge's decision on the negligence claims.

The parties agree that the determinative issue (as to both the

---

[13]The parties do not dispute the judge's conclusions with respect to Commerce's duty to defend.

social host liability and negligence claims) is whether the plaintiffs' injuries arose out of the use of Ultimate's van.[14,15] "There is no bright line test indicating when an injury may be said to arise out of the use of an automobile." *White* v. *American Cas. Ins. Co.*, 53 Mass. App. Ct. 66, 70 (2001). "Whether a particular injury is sufficiently related to an automobile's use must be decided on a case-by-case basis and requires 'a judgment call . . . as to where along a continuum of causation fall the facts of each case.' " *Id.*, quoting *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co.*, 430 Mass. 794, 797 (2000).

"[T]here must be a causal connection between a motor vehicle's use and an injury for the injury to be deemed to have arisen out of the ownership, maintenance, or use of the motor vehicle." *Roe* v. *Lawn*, 418 Mass. 66, 69 (1994). "The expression 'arising out of' indicates a wider range of causation than the concept of proximate causation in tort law. . . . However, the expression does not refer to all circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle." *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co.*, *supra* at 797, quoting *Rischitelli* v. *Safety Ins. Co.*, 423 Mass. 703, 704 (1996). "For an injury to 'arise out of' an accident, there must be a sufficiently close relationship between the injury and the accident." *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co.*, *supra* at 798. "An injury arises out of the use of a vehicle within the provisions of an automobile insurance policy when a causal connection is

---

[14]While Commerce's commercial automobile policy contains the phrase "resulting from" (covering "bodily injury . . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto' ") instead of "arising out of," the parties do not contend that there is any meaningful difference in the language. See *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co.*, 430 Mass. 794, 797 (2000) (relying on authorities interpreting "arising out of" to construe "resulting from" language in automobile policy). Indeed, in Massachusetts, any "[m]otor vehicle liability policy" must provide indemnification against loss "*arising out of* the ownership, operation, maintenance, control or use" of the covered vehicle (emphasis added). G. L. c. 90, § 34A.

[15]The term "use" is not at issue. "The term 'use' must be understood in its most comprehensive sense; and the term is not confined to motion on a highway, but extends to any activity in utilizing the insured vehicle in the manner intended or contemplated by the insured." 8A G. Couch, Insurance § 119:37, at 119-55 to 119-56 (3d ed. 2005).

reasonably apparent between the use to which the vehicle is being put and the resulting injury." 8A G. Couch, Insurance § 119:30 (3d ed. 2005). See 6B J.A. Appleman, Insurance Law and Practice § 4317, at 360-363 (rev. ed. 1979) (explaining phrase "arising out of" use of is "ordinarily understood to mean originating from, incident to, or having connection with the use of the vehicle").

Commerce argues that the plaintiffs' injuries did not arise out of the use of Ultimate's van because no alcohol was supplied by Ultimate, or Broderick, in the van and because Ultimate's van was not involved in the collision. We reject these arguments. Commerce's contentions ignore the broad construction we have given to the phrase "arising out of." See *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co., supra* at 797-798. The argument also overlooks the consideration that no requirement exists that the insured vehicle itself produce the injury. See, e.g., *Roe* v. *Lawn, supra* at 69 (bus driver's sexual assault on passenger in school bus arose out of use of bus for transportation for victim between home and school); *LaPointe* v. *Shelby Mut. Ins. Co.*, 361 Mass. 558, 563-564 (1972) (explosion caused by negligently installed propane gas tank was sufficiently connected to motor vehicle used to deliver tank to be deemed to have arisen out of vehicle's use); *Assetta* v. *Safety Ins. Co.*, 43 Mass. App. Ct. 317, 319 (1997) (injury to plaintiff, struck by bottle thrown from moving automobile, arose from use of vehicle). See also 8A G. Couch, Insurance, *supra* at § 119:31 ("coverage of a policy for liability and damages 'arising out of the use of' a vehicle is effective although there is no actual physical contact of the vehicle with the persons or property harmed").[16]

Here, the van was used consistently with Ultimate's business objectives, namely, to permit passengers to get intoxicated while another (Ultimate's employee) took care of the driving. It is of

---

[16]See also *Earl W. Baker & Co.* v. *Lagaly*, 144 F.2d 344, 345-346 (10th Cir. 1944) (concluding that injury and death to child, who was struck by truck while crossing street after getting off insured school bus, arose out of "operation" of bus); *Pacific Employers Ins. Co.* v. *Michigan Mut. Ins. Co.*, 452 Mich. 218, 220-221, 229 (1996) (concluding that injury to child, who was discharged at wrong stop by school bus driver and was injured crossing street at unfamiliar location trying to find her way, arose out of "use" of school bus under automobile liability policy covering bus).

no consequence to the coverage issue that Ultimate did not provide alcohol to its passengers because Ultimate (and Broderick) knew that Powers and the other passengers were consuming alcohol in the van and were getting drunk. Ultimate and Broderick should have dropped off those intoxicated passengers at a location from which they likely would not drive. The risk of harm is not too far removed to lack the required nexus under the broad causation standard that applies. It is a reasonable incident that was contemplated in the first instance when the parties originally entered a contract for the transportation service. We conclude that, as to the claims of social host liability and negligence, the commercial automobile policy provides coverage and imposed a duty to indemnify on Commerce.[17]

We turn now to the plaintiffs' argument that, under the business owners policy, there is coverage for the death and the injuries because the indorsement provides coverage for bodily injury sustained off of Ultimate's premises. The plaintiffs rely on the language of the indorsement providing coverage for " 'bodily injury' . . . arising out of . . . operations necessary or incidental to [the] premises." They acknowledge that the issue is novel and that there is a division of authority outside of Massachusetts on the issue. See *Home Ins. Co.* v. *Phillips*, 815 F. Supp. 1471, 1473 (S.D. Fla. 1993) (noting lack of consensus among courts that have considered issue).

The plaintiffs explain that the very nature of Ultimate's business involved driving passengers, including intoxicated ones, and that any resulting accidents necessarily would occur off of its designated premises. As such, the plaintiffs contend that this business operation (of driving its passengers) is incidental to the premises. What cannot be overlooked, however, is that this business operation exclusively relies on the use of Ultimate's van, a point recognized by the plaintiffs. The business owners policy expressly excludes coverage for bodily injury "arising out of the . . . use . . . of any . . . auto . . . owned or operated by . . . any insured." The plaintiffs concede that the exclusion "may apply," but attempt to avoid its application by claiming that the

---

[17]As a practical matter, in light of our conclusion that summary judgment was correctly granted on the social host liability claims, there is no liability on those claims to indemnify.

injury that arose out of the use of the premises also included injury caused by Ultimate's failure to establish "policies and procedures concerning the possession and use of alcohol and the discharge of grossly intoxicated passengers." However, even under that view, Ultimate's van was used to discharge intoxicated passengers, and Ultimate's van should have been used in accordance with policies and procedures concerning the possession and use of alcohol in the van. The use of the van is the predicate for all the plaintiffs' claims. Because the injury arose out of the use of Ultimate's van (or failure to use the van in a certain manner), the exclusion applies to bar coverage under the business owners policy. We therefore need not address concerns regarding "overlap[ping]" coverage.

3. *Conclusion.* We conclude that summary judgment was properly granted on the plaintiffs' social host liability claims, but was improperly granted on the plaintiffs' negligence claims. Summary judgment on the social host claims is affirmed. Summary judgment on the negligence claims is vacated, and those claims are to stand for trial, or other proceedings, in the Superior Court. With respect to the insurance coverage action, a declaration is to enter stating that, under the commercial automobile policy, Commerce has a duty to indemnify the plaintiffs, and that, under the business owners policy, the exclusion bars coverage for Waters's death and the plaintiffs' injuries.

*So ordered.*

CORDY, J. (concurring in the judgment, with whom Marshall, C.J., and Botsford, J., join). In this case, we consider whether a private carrier for hire that permitted a passenger to consume alcoholic beverages — here alcoholic beverages that the carrier did not purchase or supply — while traveling in one of its vehicles may be liable for a death and serious personal injuries caused shortly thereafter by that passenger's negligent operation of a motor vehicle while under the influence of alcohol. Consistent with tort principles previously recognized by this court, I conclude that a private carrier owes a duty to a third person who is injured by the negligence of one of its passengers whom

it permitted to drink alcohol while in the vehicle, when the private carrier knew or reasonably should have known that the passenger was intoxicated. Consequently, I concur with the court's judgment that in the particular circumstances of this case, summary judgment for the defendants should be set aside.

In my view, a private carrier's duty follows from its ability to control the use of alcohol in its vehicle, a use lawful only to an enterprise, like Ultimate, that contracts for the transportation of persons.[1] The imposition of liability in these circumstances is consistent with our precedents recognizing a duty to the general public where persons are in a position to control effectively the alcohol consumption of third parties. It also takes into account changing social conditions and contemporary public policy.

As a general proposition, "there is no duty to protect others from the criminal or wrongful activities of third persons." *Jupin* v. *Kask,* 447 Mass. 141, 148 (2006) (*Jupin*), quoting *Mullins* v. *Pine Manor College,* 389 Mass. 47, 50 (1983). There are, however, limited exceptions to that rule. One area of exemption that the court has frequently recognized concerns drunk driving. Thus, the court has held in a number of instances that parties who violate alcohol-related, statutory responsibilities have a duty to protect the general public. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.,* 390 Mass. 6, 10-13 (1983) (*Michnik-*

---

[1] See Massachusetts open container law, G. L. c. 90, § 24I, as amended by St. 2000, c. 294, § 1, which provides in relevant part:

"(*b*) Whoever, upon any way or in any place to which the public has a right of access, or upon any way or in any place to which members of the public have access as invitees or licensees, possesses an open container of alcoholic beverage in the passenger area of any motor vehicle shall be punished by a fine of not less than $100 nor more than $500.

"(*c*) This section shall not apply to (1) the passengers of a motor vehicle designed, maintained and used for the transportation of persons for compensation, or (2) the living quarters of a house coach or house trailer."

The open container law was first enacted in 1982. St. 1982, c. 373, § 10. Originally, the section prohibited anyone from operating a motor vehicle while drinking from an open container of any alcoholic beverage. The 2000 amendment rewrote the law to prohibit in § 24I (*b*) the possession of an alcoholic beverage in a motor vehicle, and added the exception in § 24I (*c*), for passengers of a motor vehicle that is used to transport passengers for compensation.

*Zilberman*) (liquor store that sold beer to minor in violation of statute liable for wrongful death of cyclist hit by intoxicated minor who was driving automobile); *Adamian v. Three Sons, Inc.*, 353 Mass. 498, 500 (1968) (proprietor of restaurant and bar who served intoxicated patron in violation of statute could be found liable for injuries suffered by plaintiffs in motor vehicle accident caused by that patron who drove after leaving defendant's premises). Cf. *McGuiggan v. New England Tel. & Tel Co.*, 398 Mass. 152, 162 (1986) (recognizing social host's liability to one injured by guest's negligent driving, where host knew or should have known guest was intoxicated but nonetheless gave him alcohol).

In such cases, we have focused on the Legislature's intent to protect the public from harm. In *Adamian v. Three Sons, Inc.*, *supra* at 499-500, we emphasized that the Legislature had enacted a specific statute, G. L. c. 138, § 69, forbidding tavern keepers from serving alcohol to intoxicated patrons. We reasoned that the statute "was undoubtedly enacted with a purpose to safeguard, not only the intoxicated person himself, but members of the general public as well." *Id.* at 500.

Similarly, in *Michnik-Zilberman*, *supra* at 10, we noted that the Legislature had specifically proscribed the sale of alcohol to minors by G. L. c. 138, §§ 34, 69. Analyzing those statutes, we wrote that their "broadly expressed restrictions were not narrowly intended to benefit the minors and intoxicated persons alone but were wisely intended for the protection of members of the general public as well." *Id.* at 10-11, quoting *Rappaport v. Nichols*, 31 N.J. 188, 202 (1959). We concluded that the statutes in that case fixed "a standard for all members of the community, from which it [was] negligence to deviate." *Michnik-Zilberman*, *supra* at 11, quoting W. Prosser, Torts § 36, at 190 (4th ed. 1971). *Michnik-Zilberman*, like the *Adamian* case, "rests in part on the principle that a private party may be liable to members of the *general public* for reasonably foreseeable harm proximately caused by the violation of a statutorily defined standard of conduct" (emphasis in original). *Irwin v. Ware*, 392 Mass. 745, 758 (1984).

In weighing public policy considerations and general principles of tort law, we have reached a related conclusion with respect to the responsibility of a "social host" to protect the general

public from alcohol-related injuries caused by their guests. While, as *McGuiggan* v. *New England Tel. & Tel Co.*, *supra*, reflects, social hosts may be found liable in certain circumstances, "in numerous social host cases, we have held that a social host is not liable to a person injured as a result of a guest's excessive consumption of alcohol that was not owned or furnished by the host." *Burroughs* v. *Commonwealth*, 423 Mass. 874, 878 (1996), and cases cited. We have reasoned that "as a practical matter, a social host ordinarily lacks the ability effectively to control his or her guests' consumption of alcohol not owned or furnished by the host." *Id.* The reluctance to impose a duty on a host who does not serve or furnish alcohol has extended to circumstances similar to the ones before us in this case.

Thus, for example, in *Cremins* v. *Clancy*, 415 Mass. 289 (1993), the court held that the driver of an automobile who permitted an intoxicated passenger to consume (his own) beer both at the driver's home and subsequently in the driver's vehicle, knowing that the passenger would thereafter operate his own vehicle, did not owe a common-law duty of care to other travelers on the highway. *Id.* at 292-294. The decision was grounded in the court's established jurisprudence that the "dominant consideration in a case of this type" is the "factor of control." *Id.* at 293, quoting *Ulwick* v. *DeChristopher*, 411 Mass. 401, 406 (1991). While the defendant (driver) in that case had provided "a setting and an atmosphere" (both at his home and in his vehicle) where the passenger could drink, the passenger was the one who "brought the beer to the defendant's home." *Id.* at 294. Even though there was evidence that the operator considered the alcohol to "belong" to all of the people in the vehicle, the court concluded that "we do not think the [operator] had the obligation, or the means, effectively to control the supply of beer and, therefore, stop [the passenger] from drinking [it]. . . . In the absence of a right to exercise effective control, the [operator] was not subject to a duty to act to protect the plaintiffs," *id.* at 294, who were injured when the passenger subsequently drove his own vehicle home.

The principles reiterated in the *Cremins* case provide a reasoned basis to recognize that a private carrier has a duty to the general public in certain circumstances. This is because of the

contractual relationship between Ultimate and its passengers. It is the contracting for private transportation services that provides Ultimate with both the exemption from the open container law, a law intended to protect the public from intoxicated drivers, and an ability effectively to control the consumption of alcohol in its vehicles. To the extent that Ultimate (and by extension its driver, Broderick), permitted a passenger to consume alcohol in its vehicle when it knew or should have known that the passenger was intoxicated, it assumed a duty of care to members of the public who might become the victims of that passenger's intoxication.[2] Although the plaintiffs must show that Ultimate knew or should have known of the passenger's intoxication and thereafter permitted him to consume alcohol, they would not be required to show that Ultimate knew or should have known that the intoxicated passenger would drive a car. See *McGuiggan* v. *New England Tel. & Tel. Co.*, supra.[3]

This result is consistent with society's strong public policy against drinking and driving, a policy that also includes the encouragement of persons to use alternative means of transportation when they plan to consume alcohol. The court must be careful not to create liabilities that are so expansive as to discourage the use or reduce the practical availability of such alternatives.

This result is also consistent with the duty we imposed on a homeowner in *Jupin, supra.* In that case, we held that "a homeowner who permits a guest to keep guns permanently on her premises and allows a third person with a criminal history and mental difficulties unsupervised access to the property, has a duty [to third parties] to ensure that the firearms are properly and safely stored." *Id.* at 156. In concluding that the imposition of this duty was appropriate, we recognized the statutory framework intended to protect the public from guns getting into the hands of

[2]This duty does not extend to overseeing, supervising, or controlling the drinking conduct of passengers at other establishments; the duty rather comes into play only when a contract carrier such as Ultimate allows intoxicated passengers to drink in the contracted-for vehicle.

[3]Ultimate has the ability, through the terms of its contract with those being driven in its vehicle, to refuse to allow an intoxicated passenger to drink or to continue to drink in the vehicle. Because this is so, and in contrast with the social host liability cases, it should be unnecessary for the plaintiffs to show that Ultimate controlled the alcohol either by furnishing or serving it.

irresponsible persons, and the enactment of a specific statute making it unlawful for the owner of a firearm to store it in any place other than in a locked container (or with a tamper-resistant safety device). *Id.* at 153-154. While the homeowner in *Jupin* was not the owner of the gun (and therefore not specifically covered by the statute), we emphasized her affirmative agreement to permit the firearms to be stored in her house, her ability effectively to control what was stored on her property, and the creation of the very danger anticipated by the statute (access by an irresponsible person). *Id.* at 152-154.

Although described in somewhat different terms, I do not read the court's opinion to have created a duty broader than what I conclude may be imposed in the circumstances presented here — Ultimate's willingness to allow its passenger to consume alcohol in its vehicle when (a jury could find) its driver knew or should have known that the passenger was inebriated. I concur in its holding that summary judgment for the defendants must be vacated.

I also concur in the court's holding with respect to the applicability of the commercial automobile and business owners' insurance policies.